UNITED STATES, Appellee,

v.

James C. CARR, Specialist Four, U.S. Army, Appellant.

No. 42,218.

CM 440271.

U.S. Court of Military Appeals.

Aug. 6, 1984.

For Appellant: *Captain William T. Wilson* (argued); *Colonel Edward S. Adamkewicz, Jr., Major Raymond C. Ruppert, Captain David M. England, Captain Edward J. Walinsky* (on brief); *Colonel William G. Eckhardt, Colonel R. Rex Brookshire, II, Major Charles A. Byler.*

For Appellee: *Captain Gary L. Hoffman* (argued); *Lieutenant Colonel John T. Edwards, Major Michael L. DeBusk* (on brief); *Colonel R.R. Boller.*

*Opinion of the Court*

EVERETT, Chief Judge:

Contrary to his pleas, Carr was convicted by a general court-martial at Fort Carson, Colorado, of rape and possession of marihuana, in violation of Articles 120 and 134 of the Uniform Code of Military Justice, 10 U.S.C. §§ 920 and 934, respectively. His sentence to a dishonorable discharge, confinement for 3 years, and forfeiture of all

1. The third and fourth issues were specified by

pay and allowances, was approved by the convening authority; and the United States Army Court of Military Review affirmed the findings and sentence without opinion. This Court granted appellant's petition on these four issues: [1]

I

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE APPELLANT BY INSTRUCTING THE COURT MEMBERS THAT THEY COULD NOT CALL WITNESSES, SPECIFICALLY SPECIALIST LILES, AND BY ADVISING THE MEMBERS THAT THEY WOULD HAVE TO DECIDE THE ISSUE OF GUILT OR INNOCENCE WITH THE FACTS BEFORE THEM.

II

WHETHER THE MILITARY JUDGE ERRED TO APPELLANT'S PREJUDICE BY FAILING TO INSTRUCT THE COURT ON THE REASONABLY RAISED DEFENSE OF MISTAKE OF FACT.

III

WHETHER AN ANONYMOUS POST–TRIAL LETTER, PURPORTING TO BE AUTHORED BY A COURT MEMBER, WHICH RAISES ALLEGATIONS OF IMPROPRIETY DURING DELIBERATIONS ON FINDINGS AND WHICH INDICATES FAILURE TO COMPLY WITH THE INSTRUCTIONS OF THE MILITARY JUDGE, SHOULD HAVE BEEN REFERRED BY THE CONVENING AUTHORITY TO THE MILITARY JUDGE FOR FURTHER INQUIRY.

IV

WHETHER IN LIGHT OF UNITED STATES V. MASSEY, 5 USCMA 514, 18 CMR 138 (1955), THE STAFF JUDGE ADVOCATE'S POST–TRIAL ADVICE WAS PREJUDICIALLY INCOMPLETE

the Court.

IN THAT IT FAILED TO APPRISE THE CONVENING AUTHORITY THAT HE HAD DISCRETIONARY POWER TO ACCORD ACCUSED SOME FORM OF RELIEF OR FURTHER INQUIRY INTO THE MATTER RAISED IN APPELLATE EXHIBIT XLV AND IN RESPECT TO AN ALLEGED FAVORABLE POLYGRAPH TEST RESULT.

## I

### A.

On May 29, 1980, Carr and a friend, Specialist Four Liles, ran out of gas near the home of Ms. Evelyn Vila. She took them to a service station and en route mentioned to Liles that her husband, a servicemember, was away on temporary duty. Two days later, Carr appeared at the Vila residence around midnight. Ms. Vila's two children—eight and three years of age—were asleep; and no one else was present. According to her testimony, Carr offered her marihuana, and when she refused, he forced entry into the house, struggled with her, and ultimately raped her.

Appellant's version was that Liles had told him that Ms. Vila wanted male companionship. Therefore, he had gone to her residence, where he had intercourse with her consent. Although she had said "no" once—just before intercourse, he had interpreted this as "sort of like a guilt feeling" on her part. She had offered no physical resistance and had not screamed. Indeed, she told him afterwards that she had enjoyed the intercourse.

Other evidence tended to establish that neighbors who were in a position to hear any loud noises at the Vila residence had heard no screams or unusual sounds on the night of the alleged rape, and a neighbor's dog had not alerted to any noise. Furthermore, although Ms. Vila testified that a struggle had occurred, the furniture and various glass objects sitting thereon were undisturbed, and her two sleeping children apparently had not awakened.

The defense also called as a witness, Patricia Wyka, from the Victim Service at the Colorado Springs Police Department. Ms. Wyka had dealt with literally hundreds of rape and bogus-rape complaints over a five-year period. The defense offered her testimony as an expert on sexual-assault victims and their reactions, to demonstrate that Ms. Vila had not acted as a genuine rape victim would.

### B.

At various points during the trial, written questions to witnesses had been presented by court members to be considered by the military judge, who permitted proper questions to be asked. At the end of the defense evidence, a court member directed this written inquiry to the judge:

> Is it legal possible/admissable [sic] for a panel member to request testimony of a witness who has not been called? In this case,—Lyle [sic]?

The military judge responded:

> Okay, with regard to the question, ..., I would say that I realize that not all of your questions have been answered in this case. And I'm well aware of the fact that that can be frustrating to the members. But, to some degree we have to take the case as counsel presents it to us. The fact that a question has not been answered does not necessarily mean that the question is unimportant. However, there is a very simple rule to follow to resolve that kind of problem and that is this. If after all the evidence is presented, and the instructions have been given to you, and you have questions, and those questions are serious enough that a reasonable doubt, as I will later define that term for you, exists as to the accused's guilt of any offense, and I will explain the offenses to you, then your duty is to vote not guilty as to that offense.

The court members submitted no additional questions after receiving this instruction, and they neither requested that Liles

testify nor sought further explanation from the judge.

The prosecution offered a rebuttal character witness and rested. After extensive arguments and instructions, the court-martial closed to deliberate. After about three hours of deliberations, the members requested further instructions as to voting procedures. Then, after another hour, they reopened to announce the findings of guilty.

### C.

During the presentencing portion of the trial, the defense attempted unsuccessfully to offer in evidence the results of a favorable polygraph test that had been performed on appellant.[2] The polygraph results were later mentioned by defense counsel in his *Goode*[3] reply to the staff judge advocate's review. In a subsequent addendum to the post-trial review, the staff judge advocate discussed the polygraph results briefly and noted that they were inadmissible. However, he never advised the convening authority as to what use, if any, could be made of the test results.

### D.

The trial ended on August 30, 1980. Thereafter, the military judge received an unsigned, typewritten letter in an envelope postmarked September 5. (*See* Appendix 1.) The letter, which purported to be from a court member, indicated that the president of the court-martial had pressured the other members to vote for conviction, contrary to the instructions they had received. The judge prepared a Memorandum of Record to the Convening Authority dated September 9, in which he stated that he did not believe he could take "any action" at the time. Subsequently, defense counsel's *Goode* reply requested the convening authority to direct an investigation into the allegations about the events that had occurred during the court members' delibera-

tions. In this connection, the convening authority was provided a statement by defense character witnesses that they had overheard a portion of the deliberations during which an individual, his voice louder and angrier than the rest, seemed to be attempting to convince the other members of Carr's guilt and to overcome their concerns about sufficiency of the evidence. (*See* Appendix 2.) The staff judge advocate's addendum to the post-trial review advised the convening authority that the unsigned letter was inadmissible to impeach the findings.

### II

■ As this Court has emphasized, "[A] court-martial has the unrestricted right to call for further witnesses, subject only to the ... [military judge's] determination of admissibility." *United States v. Parker*, 7 U.S.C.M.A. 182, 186, 21 C.M.R. 308, 312 (1956). *See also United States v. Rogers*, 14 U.S.C.M.A. 570, 34 C.M.R. 350 (1964); *United States v. Smith*, 42 C.M.R. 726 (A.C.M.R. 1970). Indeed, one justification that has been advanced for the court-selection criteria contained in Article 25 of the Uniform Code, 10 U.S.C. § 825, is that, because the members of a court-martial have the power to ask questions and request witnesses, it is important that they be selected with care. *See United States v. Guilford*, 8 M.J. 598, 602 (A.C.M.R. 1979), *pet. denied*, 8 M.J. 242 (1980).

It was obvious at trial from appellant's testimony that Liles might have relevant information. Since this case was tried before the Military Rules of Evidence took effect, Mil.R.Evid. 412 would not have restricted Liles from testifying. Instead, the information he possessed might have been admissible not only to show consent but also, under the evidentiary rules then applicable, to show Ms. Vila's lack of credibility. *Cf.* para. 153*b*, Manual for Courts-Martial, United States, 1969 (Revised edition). Fur-

---

**2.** At the Article 32, Uniform Code of Military Justice, 10 U.S.C. § 832, hearing, a military polygraph examiner testified to Carr's truthfulness.

**3.** *United States v. Goode*, 1 M.J. 3 (C.M.A. 1975).

thermore, even under Mil.R.Evid. 412b, the evidence might have been admissible, because it was closely related to consent and might have tended to support a claim of mistake of fact. *Cf. United States v. Hollimon*, 16 M.J. 164 (C.M.A. 1983); *United States v. Dorsey*, 16 M.J. 1 (C.M.A. 1983).

In view of the court-martial's right to call witnesses, the military judge should have given a more positive answer to the court member's question. Because of the defense's failure to call Liles originally or to request an opportunity to call him as a witness after the court member's question, we are reluctant to find prejudice in the judge's instruction. This is especially so, since the instruction, under one reading, might have been interpreted to mean that the court members could view the absence of testimony from Liles as giving rise to a reasonable doubt of appellant's guilt, and since none of the court members ever stated definitely that they wished to have Liles testify if it were "legal[ly] possible" for him to do so.

### III

■ The military judge has a responsibility to instruct the court members on potential defenses. *See United States v. Gaiter*, 1 M.J. 54, 56 (C.M.A. 1975); *United States v. Graves*, 1 M.J. 50, 53 (C.M.A. 1975). Usually an honest and reasonable mistake of fact is a defense, even in a crime involving general criminal intent. *See, e.g., United States v. Scheunemann*, 14 U.S.C.M.A. 479, 34 C.M.R. 259 (1964). In paragraph 199b, the Manual for Courts-Martial expresses one exception to this principle when it states—in accord with considerable precedent—that ignorance or misinformation as to the true age of the victim is no defense in a prosecution for

carnal knowledge. However, paragraph 199a, which deals with rape, expresses no such exception as to consent. Likewise, we perceive no occasion to deviate in rape cases from the principle that an accused can be excused by an honest and reasonable mistake of fact.

The Government contends that a mistake of fact cannot be honest and reasonable if the accused knows that, even if his mistaken belief is true, he is committing a crime. The corollary argument is that, because Carr knew that he was committing the crime of adultery by having intercourse with a married woman, he is precluded from claiming mistake of fact.

Whatever the merits of this position in the abstract, we are reluctant to apply it here in view of the heavy penalty authorized for the crime of rape, as compared with the 1 year's confinement allowed for adultery. *See* Table of Maximum Punishments, para. 127c, Manual, *supra*.[4] Indeed, it would seem almost whimsical to let guilt or innocence of rape hinge on the marital status of one of the participants. This is especially true since adultery is prosecuted infrequently—usually only in conjunction with other misconduct. Indeed, although adultery is mentioned in paragraph 213c, Manual, *supra*, and in the Table of Maximum Punishments, and is the subject of a form specification (no. 127) in the Manual, *see* appendix 6c, it is not discussed elsewhere in the Manual.[5] In light of these circumstances, we conclude that to let guilt or innocence of rape hinge on the presence or absence of adultery would be unreasonable.

■ Even though the presence of adultery does not disqualify Carr from claiming honest and reasonable mistake as to rape,

---

4. Article 120, UCMJ, 10 U.S.C. § 920, authorizes death as a punishment for rape. However, in light of *United States v. Matthews*, 16 M.J. 354 (C.M.A. 1983), apparently life imprisonment will generally be the maximum punishment for rape.

5. In *United States v. Johanns*, 17 M.J. 862, 865 (A.F.C.M.R.), *certified on other issues*, 17 M.J. 197 (1983); *pet. granted on another issue*, 18

M.J. —— (Daily Journal, July 6, 1984), the accused contended that adultery is not a crime unless the servicemember is married—rather than the person with whom he has intercourse. Among civilian jurisdictions there exists considerable diversity in the definitions of adultery. *See* Moore, *Diverse Definitions of Criminal Adultery*, 30 U. Kan. City L.Rev. 219 (1962).

we do not believe that the defense was reasonably raised in this case. According to appellant's testimony, he was relying on a general remark that Ms. Vila had made to Liles, rather than to him. Moreover, he came to her house late in the evening, without any prior specific invitation and under circumstances which would have suggested that, even if Ms. Vila were generally disposed to intercourse, she would have been unwilling at that particular time and place. Finally, even Carr conceded that she had said "no" on one occasion just prior to intercourse; and it was hardly reasonable for him to brush aside this negative response on the assumption that she merely experienced feelings of guilt because of her marital misconduct.

 Although the absence of a request for an instruction as to mistake of fact in no way relieves a judge of his responsibility, we believe that here it tends to corroborate our reading of the record—namely, that the *only* issue was consent. Therefore, we conclude that Carr was not prejudiced by the absence of the instruction.

### IV

 The judge received an unsigned typewritten letter containing allegations that the court members had been subjected to undue pressure from the president, who, of course, was senior to the other members in rank. A statement by persons who had overheard the deliberations tended to corroborate the allegations. Although jurors usually cannot impeach their verdict, this principle is not applied in the military context when there is a contention that an "outside influence was improperly brought to bear upon any member, or" that "there was unlawful command influence." *Cf.* Mil.R.Evid. 606(b). The president's exercise of the influence of his rank on the members of the court would fall within this exception. Moreover, there also was extrinsic evidence of misconduct during the deliberations. (App. 2.) Therefore, we conclude that the military judge is not precluded from investigating allegations of

misconduct and undue influence like those in the present case. In cases like *United States v. Brickey*, 16 M.J. 258 (C.M.A. 1983), and *United States v. Witherspoon*, 16 M.J. 252 (C.M.A. 1983), we made clear that the judge can, and should, hold a post-trial Article 39(a), UCMJ, 10 U.S.C. § 839(a), session when allegations of juror misconduct are brought to his attention. Here the judge misperceived his power. The staff judge advocate also labored under the misapprehension that a post-trial hearing was inappropriate on the allegations contained in the unsigned letter, and he was equally in error. *See United States v. Brickey, supra.* In view of the failure to conduct a post-trial hearing, the integrity of the trial proceedings and the resultant findings is undermined. Therefore, appellant was prejudiced, and the findings of guilty must be set aside.

### V

 The staff judge advocate also erred in his treatment of the polygraph-test results, which the defense had sought unsuccessfully to offer into evidence at trial and later had brought to the attention of the convening authority in his reply to the staff judge advocate's review. The staff judge advocate seems to have taken the position in his addendum that the results of a polygraph test were legally inadmissible and that this was the end of the matter. In so doing, he forgot the teachings of *United States v. Massey*, 5 U.S.C.M.A. 514, 18 C.M.R. 138 (1955), decided a quarter century before, which makes clear that, under these circumstances, a convening authority may consider the results of a polygraph test—or almost any other information favorable to the accused he chooses—in deciding whether to extend clemency. The convening authority should have been advised to this effect. Of course, we need not determine whether this omission was prejudicial, in light of the action dictated by the preceding error.

### VI

The decision of the United States Army Court of Military Review is reversed. The

findings and sentence are set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.

Judge FLETCHER and Senior Judge COOK concur.

## APPENDIX 1

Judge Jacobe

Military Judge

Court House

Fort Carson, CO 80913

Dear Judge Jacobe:

On 28, 29, and 30 August, I had the occasion to be a jury panel member for a case that was tried here at Fort Carson. During the deliberation portion of the trial on findings I feel that there were certain irregularities that took place on discussion and voting of the case that I think should be brought to your attention.

I would first like to state that I understood most of the instructions that were given to the panel before we retired to deliberate on findings. But, during the discussion before voting there was intense pressure put on certain members of the court by the President, Col Berg, and I must now come forward and advise you that I didn't vote according to my conscience, but rather because of pressure put on certain members of the court including myself by the president of the court. And I truely feel that the accused, Specialist Carr, was found guilty because of these irregularities.

I, of course, am an officer in the military and in that respect there are certain things expected of me. And being a junior to most of the members that were on the court I was under intense pressure to follow the advise of the President. In one instance, I feel, that we had reached a verdict of not guilty when the president insisted that we vote again. There was a point when LTC Knudsen insisted that we go back into court for a clarification on the revoting procedures as he and some other members felt that Col Berg had interpreted the rules incorrectly. After your rein-structing us as to the correct procedure in which Col Berg was overruled it seemed as though the momentum had already started and it was too late to stop what irregularities had already taken place.

I don't know what steps can be taken to correct this, but, my conscience will not let me keep silent any longer as I believe that Specialist Carr, and I am not alone in this belief, was improperly convicted.

I am sorry that I cannot sign my name to this letter as it would surely be detrimental to my career, a sad commentary on our justice system. Rest assured that if he would have been tried with a different president the outcome would surely have been different. Copies of the letter will be forwarded to the defense counsel and General Menetrey, the convening authority.

Sincerely

## APPENDIX 2
### STATEMENT

While the jury was deliberating and discussing the verdict of SP/4 James Carr, I was sitting in one of the rooms located directly across from the jury with SP/4 Carr's sister and exgirlfriend. As the jury first entered the room I could hear laughter and joking between the jury. One of the jury members was louder than the others and I heard him say, "How do you spell that? N–O–T G–U–I–L–T–Y!." I then heard a louder voice say, "Now wait A minute!!" or words to that effect. The second voice seemed aggrieved or angry in my opinion. Throughout the period the jury was deliberating I could hear one voice much louder and overpowering in comparison to the other jury members. I heard one of the jury members talking about the victim's testimony concerning the way her panties were supposedly ripped or pulled off like that, the jury member laughing said, "Even I can't take mine off like that," or words to that effect. I then heard one of the jury members mention the fact that there was a guard dog right next door and that the dog was not alerted. The jury member with the loudest voice then brought up the fact

very loudly that the dog could be worthless and might have been sleeping. The man with a loud voice then started talking about the back door being unlocked, and he used a comparison between his wife and the victim saying "My wife always locks the back door whenever I'm gone and it's late at night."

I believe she was trying to open the door to get out" or words to that effect. Throughout the entire time the Jury was out of the courtroom I could hear voice interrupting, shouting, and pushing his opinions upon the other jury members, at more than one time I even went to SP4 Carr's lawyer's because the voice was so loud and sounded so angry. I was only one of the approximately fifteen people who could hear this loud voice. When I walked completely down the hallway to the witnesses room, the people waiting in that room could hear how loud and determined that voice was. I at no time was trying to go near the jury's room to hear the discussion taking place. I heard the statements of the jury members because they were talking so loudly. In my opinion, that one jury member was trying to hard to make sure the other members of the jury were as convinced as he was about the guilt or innocence of SP4 Carr. This statement is all my own opinion or as best as I can remember, concerning the events or statements of SP4 Carr's trial, and they are not intentionally changed or altered in anyway.

END OF STATEMENT

SFC Thomas Hargis, /s/ Thomas Hargis
SSG Rick Mc Donald
SSG Jeffery Meiling (I heard all of the above statement) /s/ Jeffery Meiling
SP5 Randy Lawson /s/ Randy Lawson
SP5 Gary Grizzle /s/ Gary Grizzle
SP4 William Ginwright /s/ William R. Ginwright
SP4 Dana Carter /s/ Dana M. Carter
SP4 Maurice Pinkney
 The following character witnesses were in the defense waiting room and heard parts of the above statements.