# UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS

## UNITED STATES

### v.

## Daniel LEAL
### Maritime Enforcement Specialist First Class (E-6), U.S. Coast Guard

**CGCMSP 24984**
**Docket No. 1470**

**03 May 2021**

Special court-martial tried on 23-27 April 2018.

| | |
|---|---|
| Military Judge: | CDR Tamara S. Wallen, USCG |
| Appellate Defense Counsel: | LCDR Jeffrey G. Janaro, USCG |
| | LT Carolyn M. Bray, USCG (argued) |
| Appellate Government Counsel: | LCDR Daniel M. Wiltshire, USCG (argued) |
| | LT Nicholas J. Hathaway, USCG |
| Special Victims Counsel: | LCDR Jason W. Roberts, USCG |
| | Mr. Paul T. Markland |

## BEFORE
## McCLELLAND, BRUBAKER & KOSHULSKY
Appellate Military Judges

BRUBAKER, Judge:

In 2016, a special court-martial (*Leal I*) convicted Appellant, contrary to his pleas, of a single specification of abusive sexual contact in violation of Article 120, Uniform Code of Military Justice (UCMJ).[1]  It adjudged, and the Convening Authority approved, a sentence of reduction to E-1, confinement for thirty days, and a bad-conduct discharge.  On appeal, we concluded the specification failed to state an offense and set aside the conviction, dismissed the charge and specification, and authorized a "new trial . . . upon a different specification."  *United States v. Leal*, 76 M.J. 862, 863 (C.G. Ct. Crim. App. 2017).

---

[1] Based on the dates of alleged offenses, all references to the UCMJ are to the 2016 version, which was subsequently amended by the Military Justice Act of 2016, Pub. L. No. 114-328, 130 Stat 2000.

Upon return of the case, the Convening Authority referred two specifications to a special court-martial (*Leal II*) based on the same underlying conduct: one alleging assault consummated by a battery in violation of Article 128, UCMJ, and one alleging maltreatment in violation of Article 93, UCMJ.  A panel of officer and enlisted members acquitted Appellant of assault, but convicted him, contrary to his pleas, of maltreatment.  The members sentenced Appellant to reduction to E-5 and restriction for fifteen days, which the Convening Authority approved.

Appellant now raises three issues for our consideration:

1) Whether the military judge violated Appellant's Fifth and Sixth Amendment rights by not allowing his counsel to examine the members during a post-trial session under Article 39(a), UCMJ;

2) Whether the military judge failed to develop an adequate record into alleged unlawful command influence during deliberations and abused her discretion by denying a motion for mistrial; and

3) Whether Appellant is entitled to relief for unreasonable post-trial delay.[2]

We find no merit in the first issue, but we agree with Appellant that there is an inadequate record into whether unlawful command influence tainted deliberations and that unreasonable post-trial delay warrants relief.  Based on both errors and the circumstances of this particular case, we set aside the findings and sentence.

## Jurisdiction

Before moving to the substance of this case, we must determine whether we have jurisdiction over it.  Although the sentence in *Leal II* falls short of the jurisdictional minimum of Article 66(b), UCMJ, both parties assert that the doctrine of continuing jurisdiction applies—that jurisdiction over *Leal I*, with its jurisdictional sentence, extends to *Leal II*.  We ultimately agree, but though the doctrine of continuing jurisdiction is generally well-established, there is scant precedent applying it to the procedural setting of this case: fresh charges referred to a court-martial after an appellate court dismissed the original ones.

---

[2] We heard oral argument on issues 2 and 3.

Jurisdiction is a legal question that we review *de novo*. *Randolph v. HV*, 76 M.J. 27, 29 (C.A.A.F. 2017). "[E]very federal appellate court has a special obligation to satisfy itself of its own jurisdiction." *Loving v. United States*, 62 M.J. 235, 239 (C.A.A.F. 2005) (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)) (internal quotation marks and ellipses omitted).

As an Article I court, our jurisdiction is closely circumscribed by statute. *United States v. Kelly*, 77 M.J. 404, 406 (C.A.A.F. 2018); *see also United States v. Denedo*, 556 U.S. 904, 912 (2009) (recognizing that the rule that Congress defines the subject-matter jurisdiction of federal courts "applies with added force to Article I tribunals . . . ."). Article 66(b), UCMJ, establishes jurisdiction over any court-martial in which the approved sentence extends to death, a punitive discharge, or confinement for one year or more. Under the long-recognized doctrine of continuing jurisdiction, if a military appellate court, exercising jurisdiction based on sentence severity, finds error and remands the case with a rehearing authorized, jurisdiction will continue over the rehearing even if it results in a sentence below Article 66's minimum. *United States v. Boudreaux*, 35 M.J. 291, 295 (C.M.A. 1992). The rationale is that a rehearing is a continuous part of the same case as the initial trial, and once jurisdiction attaches to a case, "no action by a lower court or convening authority will diminish it." *Id.* at 295; *see also United States v. Davis*, 63 M.J. 171, 177 (C.A.A.F. 2006) ("A rehearing relates back to the initial trial and to the appellate court's responsibility to ensure that the results of a trial are just.").

Under this precedent, had *Leal II* been a *rehearing* of *Leal I*, our continuing jurisdiction would be clear. But, at least as the term is used in the Rules for Courts-Martial, *Leal II* was *not* a rehearing. The Rules expressly delineate three apparently distinct types of post-review proceedings: rehearings, new trials, and "other" trials. *See, e.g.,* Rule for Courts-Martial (R.C.M.) 810, Manual for Courts-Martial (MCM), United States (2016 ed.). The Rules do not provide a definition of "rehearing," but a new trial is one granted under R.C.M. 1210 after petitioning the Judge Advocate General on the ground of newly discovered evidence or fraud on the court-martial, R.C.M. 1210(a), and an "other" trial is "another trial of a case in which the original proceedings were declared invalid because of lack of jurisdiction or failure of a charge

to state an offense." R.C.M. 810(e). Applying these definitions, although our original decision purported to authorize a "new trial," we were, more precisely, authorizing an "other" trial.

The question then becomes: does the doctrine of continuing jurisdiction extend to "other" trials? The difference, after all, is not merely semantic. Before authorizing an "other" trial, a court does not just set aside findings, as it might before authorizing a rehearing. It also *dismisses* the offending specification, and to bring it back to life, a convening authority must refer a specification anew. *See* Discussion, R.C.M. 907(a).

There is no controlling precedent on this question, but for three reasons, we answer in the affirmative: continuing jurisdiction applies with equal force to "other" trials. First, and most importantly, Congress establishes our jurisdiction through statute, not the President through regulation—and only the latter draws a distinction between rehearings and "other" trials. Article 66(d) permits a Court of Criminal Appeals to order a rehearing *any time* it sets aside findings and sentences, with only one exception: "If the Court of Criminal Appeals sets aside the findings and sentence, it may, except where the setting aside is based on lack of sufficient evidence in the record to support the findings, order a rehearing." Article 63 too only recognizes rehearings. So in contrast to new trials, *see* Article 73, UCMJ, "other" trials have no statutory provenance. There is no indication that Congress intended jurisdiction over a subsequent proceeding to turn on the nature of the error leading to remand or whether an appellate court dismisses a specification. Instead, Congress recognized a rehearing as the one and only option for a case to be re-tried following a Court of Criminal Appeal's action under Article 66. And, as has been established, a rehearing relates back to and is part of the same case as the initial proceeding.

Second, one of the cited reasons for continuing jurisdiction is the "host of legal connections" between an initial trial and a rehearing. *United States v. Johnson*, 45 M.J. 88, 90 (C.A.A.F. 1996) (citing R.C.M. 810(d)(1) (sentence at rehearing limited to approved sentence on same charges from first court-martial); R.C.M. 810(d)(2) (effect of original pretrial agreement at rehearing); R.C.M. 1107(e)(1)(E) (finding of lesser-included offense at original court-martial precludes trial of greater offense at rehearing)). Although they do not align exactly, the Rules

offer a similar host of legal connections between an initial trial and an "other" trial. *See, e.g.,* R.C.M. 810(a); R.C.M. 810(b); R.C.M. 810(d)(1).

Third, we find persuasive authority in *United States v. Lee*, 72 M.J. 581 (N-M. Ct. Crim. App. 2013), *aff'd,* 73 M.J. 166 (C.A.A.F. 2014). There, the Navy-Marine Corps Court of Criminal Appeals considered an argument that it:

> face[d] a question of first impression, in that all of the charges and specifications upon which we authorized a rehearing have been withdrawn and dismissed, effectively ending the first trial. As a consequence, the Government argues, we have before us an entirely new charge and a sub-jurisdictional sentence, which would only come before us upon referral from the Judge Advocate General per Article 69(b), UCMJ.

*Id.* at 583.

In rejecting this argument, the Court reasoned that the rehearing was not "independent of the preceding court-martial and appeal," that it arose from the same underlying conduct, and that the Court had "'a statutory duty to review the case to completion'" unless the accused waived or withdrew his appeal. *Id.* (quoting *Boudreaux v. United States Navy–Marine Corps Court of Military Review,* 28 M.J. 181, 182 (C.M.A.1989)). Thus, the Court concluded, the referral of new charges did not sever jurisdiction. *Id.* It is worth noting that the United States Court of Appeals for the Armed Forces granted review and affirmed. *Lee*, 73 M.J. at 167. Although it did not explicitly address jurisdiction, by hearing the appeal, addressing the merits, and affirming, it implicitly indicated its satisfaction that continuing jurisdiction applied. *See Loving*, 62 M.J. at 239.

We agree with the rationale of *Lee*. We too are satisfied that continuing jurisdiction applies here despite the original charge being dismissed and fresh ones being referred.

## Unlawful Command Influence

*Background*

Following trial, the junior member of the panel, Chief Petty Officer ("Chief") H, told a Coast Guard attorney that the senior member and president of the panel, Captain (CAPT) B, had expressed "enthusiasm and strong positions" during deliberations. (Appellate Ex. 101 at 12.)

The attorney notified trial defense counsel (TDC), who interviewed Chief H. Chief H told TDC that he felt that "rank played a role" in the findings and that although CAPT B never ordered any member to vote a certain way, "the enlisted felt pressured." *Id.* TDC requested the Convening Authority, who had not yet acted on the case, to order a post-trial hearing to determine whether unlawful command influence impacted either the findings or the sentence. The Convening Authority granted the request.

The military judge held a hearing where she questioned the members, comprising a captain (O-6), a lieutenant (O-3), three senior chief petty officers (E-8), and two chief petty officers (E-7). Chief H testified that he believed that rank played a role in deliberation, not directly such as an order to vote a certain way or prefacing an opinion with a reference to rank, but indirectly. He explained that the initial plan was to have official votes on both charges, but after the panel voted not guilty on the first offense (assault), CAPT B said, "Hold on. Before you move on, we have to find this guy guilty of something." [R. at 30.] Chief H perceived this not as a direct order *per se*, but more like "me being the rank that I am, saying, 'Look, this is what needs to happen.' . . . It was more, like, announced to the room that this is what we need to do." [R. at 28.] Chief H also testified that there had been an unofficial "straw" poll prior to the official voting and that based on the results, Chief H commented to some of the other junior members, "People act funny when there's a full bird in the room." [R. at 32.] Responding to the military judge's questions, Chief H attested that he was nevertheless able to vote according to his own conscience and that CAPT B's statement did not influence his vote.

CAPT B denied that anyone ever said or ordered that Appellant must be found guilty of a charge and asserted that there was full and free discussion during deliberations and that he believed all members were able to vote according to their own conscience. The military judge questioned the remaining members but, discarding most of TDC's suggested questions and overruling his objections, she focused her inquiry on eliciting from each member that they were able to engage in full and free discussion; that no member tried to use their rank to coerce a junior member to vote a certain way; and that each member was able to vote according to his own conscience and the instructions she had provided. One member, however, indicated that although no one was ordered or coerced to vote a certain way, "inadvertently the presence of

senior officer's [sic] might have swayed, but . . . that's my opinion, that's not a fact." [R. at 113.]

Following the hearing, Appellant moved for a mistrial, alleging that CAPT B improperly used his rank to influence other members during deliberations. The military judge disagreed and denied a mistrial. Appellant asserts that the military judge conducted an inadequate inquiry into his claim of unlawful command influence and abused her discretion by denying a mistrial. Without reaching the merits of whether deliberations were tainted by unlawful command influence or whether a mistrial was warranted, we agree that we have an inadequate record upon which to properly adjudicate the claim.

*Law*

We review allegations of unlawful command influence *de novo*. *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013). Unlawful command influence—long considered the "mortal enemy of military justice," *United States v. Thomas*, 22 M.J. 388, 393 (C.M.A. 1986)—is prohibited by Article 37, UCMJ, which provides, in pertinent part: "No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial . . . or any member thereof, in reaching the findings or sentence in any case . . . ." Article 37(a), UCMJ.

An accused who raises a post-trial claim of unlawful command influence bears the initial burden to: "(1) show facts which, if true, constitute unlawful command influence; (2) show that the proceedings were unfair; and (3) show that the unlawful command influence was the cause of the unfairness." *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999). This is a low threshold: there must be "more than mere allegation or speculation," but all that is required is "some evidence" to support the three *Biagase* prongs. *Id.* Once an accused meets this threshold, a far higher burden shifts to the Government: it must prove beyond a reasonable doubt that: (1) the predicate facts do not exist; or (2) the facts do not constitute unlawful command influence; or (3) the unlawful command influence had no prejudicial impact on the court-martial. *Id.* at 151.

When reviewing allegations of unlawful command influence, "military judges and appellate courts must consider apparent as well as actual unlawful command influence." *United States v. Simpson,* 58 M.J. 368, 374 (C.A.A.F. 2003). The test for apparent unlawful influence is objective, focusing on "the perception of fairness in the military justice system as viewed through the eyes of a reasonable member of the public." *United States v. Lewis,* 63 M.J. 405, 415 (C.A.A.F. 2006). Apparent unlawful command influence exists when "an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding." *Id.*

Use of rank by a member during deliberations "in any manner in an attempt to control the independence of members in the exercise of their judgment" is unauthorized and a form of unlawful command influence. R.C.M. 921(a); *United States v. Accordino*, 20 M.J. 102, 105 (C.M.A. 1985); *United States v. Lawson*, 16 M.J. 38, 40 (C.M.A. 1983); *see also* Drafter's Analysis to M.R.E. 606(b) ("Use of superior rank or grade by one member of a court to sway other members would constitute unlawful command influence for purposes of this Rule . . . ."). A military judge is "the 'last sentinel' in the trial process to protect a court-martial from unlawful command influence," *United States v. Harvey*, 64 M.J. 13, 14 (C.A.A.F. 2006) (citations omitted), and has a duty to investigate allegations that unlawful command influence tainted deliberations. *United States v. Carr*, 18 M.J. 297, 302 (C.M.A. 1984).

Still, any inquiry into alleged wrongdoing during the deliberative process is sharply constrained. M.R.E. 606(b) generally prohibits inquiry into three areas: (1) "any statement made or incident that occurred during the deliberations of that court-martial"; (2) "the effect of anything on [a member's] vote"; or (3) "any member's mental processes concerning the finding or sentence." M.R.E. 606(b)(1). The Rule carves out three exceptions, one of which is that a member may provide evidence about whether "unlawful command influence or any other outside influence was improperly brought to bear on any member." M.R.E. 606(b)(2)(B). A panel "president's exercise of the influence of his rank on the members of the court would fall within this exception." *Carr*, 18 M.J. at 302.

But even when this exception is triggered, limitations remain. The exception allows inquiry into *objective* manifestations of impropriety, but inquiry into *subjective* effects of alleged impropriety remains prohibited. *United States v. Dugan*, 58 M.J. 253, 259-60 (C.A.A.F. 2003). This allows inquiry into M.R.E. 606(b)'s first generally-prohibited area (statements made or incidents occurring during deliberations), but the remaining two (effect on a member's vote and mental processes) are subjective and thus remain off-limits. *Harvey*, 64 M.J. at 22; *Dugan*, 58 M.J. at 259. Stated succinctly, "Even when the exceptions to [M.R.E.] 606(b) are triggered, disclosures should be limited to the fact and nature of the extrinsic evidence; the impact of the extrinsic evidence or influence on the deliberations or voting should not be disclosed." *United States v. Straight*, 42 M.J. 244, 249 (C.A.A.F. 1995)).[3]

This overrides the opportunity the Government usually gets under *Biagase* to demonstrate a lack of prejudicial impact. *Dugan*, 58 M.J. at 259 ("[W]hen unlawful command influence has been directed at court members, the Government's third option under Biagase is limited by M.R.E. 606(b)."). Instead, courts *presume* prejudice from improper influences, which the Government has the burden to rebut. *Straight*, 42 M.J. at 249. But to reiterate, any evidence, rebuttal or otherwise, must relate to objective manifestations of alleged impropriety and may not pertain to any subjective effect it had on members' votes or mental processes. *See Dugan*, 58 M.J. at 259.

*Application*

With this landscape in mind, we conclude that the military judge erred in three respects. First, although she correctly articulated the *Biagase* standard, she failed to address—either during the hearing or in her ruling—whether the Defense met its initial burden, thus shifting it to the Government. Here, as in *Harvey*, "the failure of the military judge to allocate the burden between the parties resulted in an inadequate factual basis as to the exact nature and extent of any unlawful command influence that might have been created with regard to [the members]." *Harvey*, 64 M.J. at 21. Further, even given the scant factual record, we believe that Chief H's

---

[3] Subsequent to the *Straight*, *Dugan*, and *Harvey* decisions, M.R.E. 606(b) was amended to break up prohibited areas from two into three; these changes, however, were "stylistic" and do not impact our analysis. Drafter's Analysis to M.R.E. 606(b).

testimony satisfied the low threshold of "some evidence" that rank played an impermissible role during deliberations.

Second, again as in *Harvey*, the military judge "failed to inquire adequately into" whether deliberations were tainted by unlawful command influence. *Id*. at 15. Her questions and analysis turned the required focus on its head: rather than focusing on objective manifestations that the members may have been improperly influenced—who said what, when, with what demeanor, in what context, etc.—she focused on subjective effects, such as whether each member was able to vote according to his or her own conscience and whether they were able to follow her instructions about the presumption of innocence.

Also, focusing on whether junior members were *ordered* or otherwise *coerced* into voting a certain way overlooks that there are more subtle ways that rank can impermissibly *influence* deliberations. It is true that our superior Court has said:

> Senior ranking court members, like their juniors, are free to express their opinions in the strongest terms and to engage in the most robust discussions without fear of retribution or appellate sniping. . . . It is only when recourse is made to rank to 'enhance' an argument—*i.e*., to coerce a subordinate to vote in a particular manner—that the line is crossed.

*Accordino*, 20 M.J. at 105.

The holding of *Accordino*, however, is that "the use of rank by a court member to pervert military justice is not protected" by M.R.E. 606(b), and that the lower court therefore erred by failing to consider affidavits from members. *Id*. at 104. We do not read the case as contradicting the plain language of either Article 37(a), UCMJ (prohibiting attempts "to coerce *or, by any unauthorized means, influence*" a court-martial member) (emphasis added) or R.C.M. 921(a) (prohibiting use of rank "in *any manner* in an attempt to control the independence of members in the exercise of their judgment.") (emphasis added). Thus, the questions to the members should have considered not just whether there was a direct order to vote a certain way, but whether any statement or incident during deliberations used or appeared to use rank to influence other members' votes.

10

Third, the military judge failed to properly apply the law regarding apparent unlawful command influence. In addressing the allegation of unlawful command influence, the focus of fact-finding and analysis should have been not only on whether anything was said or done to *actually* coerce or influence other members, but whether anything said or done would lead an objective, disinterested observer, fully informed of all the facts and circumstances, to harbor a significant doubt about the fairness of the proceeding—irrespective of the impact of any statements or actions. *Lewis,* 63 M.J. at 415. The questions to the members were inadequate to determine this, and the military judge did not address apparent unlawful command influence during the analysis portion of her ruling.

Again, on this record, we cannot say one way or the other whether there was actual or apparent unlawful command influence. We do, however, conclude that the issue was raised and required more penetrating investigation and analysis. Our ordinary remedy would be to order the case remanded for further fact-finding, but as we address below, we find this unnecessary.

## Post-Trial Delay

Appellant asserts he is entitled to relief due to unreasonable delay between his sentencing at *Leal II* and docketing before this Court. We agree.

"[C]onvicted servicemembers have a due process right to timely review and appeal of courts-martial convictions." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006). We review whether Appellant was denied this right *de novo*, applying a three-tiered analysis. *Id.*

First, we must determine whether the post-trial delay is facially unreasonable. *Id.* at 136. The Court in *Moreno* established standards for when post-trial delay is presumed to be unreasonable: (1) when the convening authority does not take action within 120 days of the completion of trial; (2) when the record of trial is not docketed with the Court of Criminal Appeals within thirty days of the convening authority's action; or (3) when the Court of Criminal Appeals does not render a decision within eighteen months of docketing the case. *Id.* at 142.

Second, facially or presumptively unreasonable delay triggers a full analysis of whether a due process violation occurred by weighing the four *Barker* factors: (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice. *Id.* at 135 (citing *Barker v. Wingo,* 407 U.S. 514, 530 (1972)). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136.

Third, and finally, if we conclude there was a due process violation, we must grant relief unless we are convinced beyond a reasonable doubt that the error is harmless. *United States v. Toohey*, 63 M.J. 353, 363 (C.A.A.F. 2006). However, even for delay not rising to the level of a due process violation, we can, under appropriate circumstances, grant relief under Article 66(c), UCMJ. *United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F. 2002).

Here, as the Government concedes, there was presumptively unreasonable post-trial delay. The below chronicles the timeline in this case:

| Action | Date | Days Elapsed | Days from Prior Action |
|---|---|---|---|
| *Leal II* sentence adjudged | 27 Apr 18 | --- | --- |
| TDC notified of Chief H comments | 31 Jul 18 | 95 | 95 |
| TDC requests post-trial hearing | 1 Aug 18 | 96 | 1 |
| TC endorses request | 3 Aug 18 | 98 | 2 |
| CA authorizes post-trial hearing | 6 Aug 18 | 101 | 3 |
| Post-trial hearing | 16 Oct 18 | 172 | 71 |
| Defense motion mistrial | 30 Oct 18 | 186 | 14 |
| Govt response motion mistrial | 13 Nov 18 | 200 | 14 |
| MJ authenticates record of trial | 25 Jan 19 | 273 | 73 |
| MJ ruling on mistrial motion | 17 Feb 19 | 296 | 23 |
| TDC submits clemency matters | 28 Feb 19 | 307 | 11 |
| CA Action | 2 Apr 19 | 340 | 33 |
| ROT transmitted to LMJ | 22 Apr 19 | 360 | 20 |
| Case referred to CCA | 24 Jan 20 | 637 | 277 |

As can be seen, 340 days elapsed from the sentence being adjudged to the Convening Authority's action and 297 days elapsed from the Convening Authority's action to docketing the

case with this Court. Both periods exceeded the *Moreno* standards, triggering a full analysis of whether there was a due process violation by considering each of the *Barker* factors.

### 1. *Length of the Delay*

The 637 days that elapsed from sentencing to docketing was more than fourfold the *Moreno* benchmark. This factor favors Appellant.

### 2. *Reasons for the Delay*

Some of the delay between sentencing and action is legitimately explained by the need to conduct a post-trial hearing, but 340 days was excessive. TDC requested, and the Convening Authority approved, the post-trial hearing within days of learning of Chief H's comments. Scheduling and conducting the hearing took another seventy-one days, which by itself is not necessarily inordinate, but it took 101 days after the hearing to authenticate the record and twenty-three days after that to rule on the mistrial motion. Given the lack of any explanation for this delay, it appears to us to be unreasonable, particularly considering the manageable size of the transcript: 1,148 pages including the post-trial hearing. In fact, by the time TDC requested a post-trial hearing, ninety-eight days had already elapsed from sentencing, so the trial transcript should have already been at least largely completed by that point.

Also significant is the delay from Convening Authority's action to docketing the case with this Court. The Government admits that the 297-day delay was due to their "administrative oversight." [Government's Answer at 25.] Specifically, they offer that they initially missed the fact that *Leal II* was a rehearing, meaning this Court had jurisdiction based on the original sentence in *Leal I*; therefore, instead of referring the case to this Court, it erroneously conducted a review under R.C.M. 1112. The Government does not contend that this error was reasonable and instead focuses on the remaining *Moreno* factors to assert that Appellant is not entitled to relief. The Government's candor is noted, but "delay in the administrative handling and forwarding of the record of trial and related documents to an appellate court is the least defensible of all and worthy of the least patience." *United States v. Dunbar*, 31 M.J. 70, 73 (C.M.A. 1990). The lack of any legitimate explanation for the delay in this case weighs heavily against the Government.

3. *Assertion of Right to Speedy Post-Trial Review and Appeal*

Appellant did not assert his right to speedy post-trial review until filing his initial brief to this Court. This weighs against Appellant.

4. *Prejudice*

An appellant can suffer cognizable prejudice from post-trial delay if an appellate court concludes that other error warrants a rehearing, but the appellant's ability to present a defense at the rehearing is impaired. *Moreno*, 63 M.J. at 138–40. Likewise here, we conclude there is cognizable prejudice. Having found an inadequate record upon which to determine whether deliberations were tainted by unlawful command influence, the ordinary remedy would be a post-trial hearing for further fact-finding. Some of the members, however, expressed difficulty remembering specific events during the *first* post-trial hearing six months after the trial. This would only be exacerbated by the passage of an additional two-and-a-half years. The purpose of remanding the case would be to elicit detailed information about whether there were any objective manifestations of the use of rank to influence proceedings; the members' ability to remember such details is impaired by the passage of time.

On balance, we conclude that the delay in this case amounts to a due process violation. There was significant delay without legitimate reasons, and it prejudiced Appellant. *Cf. United States v. Gosser*, 64 M.J. 93, 99 (C.A.A.F. 2006) (concluding that even absent a showing of prejudice, "a two-year delay in commencing review under Article 66(c), UCMJ, can diminish the public's perception of the fairness of military justice" and thus amounted to a due process violation). As we have already concluded there was cognizable prejudice flowing from the delay, we cannot say that it was harmless beyond a reasonable doubt. Accordingly, we turn to the question of relief. *See Toohey,* 63 M.J. at 363.

**Remedy**

Again paralleling our superior Court's analysis in *Harvey*, 64 M.J. at 22–23, we conclude that the combined errors of insufficient inquiry into alleged unlawful command influence and unreasonable post-trial delay warrant dismissal. Recognizing that dismissal is a "drastic remedy," *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004), this reflects not only our

assessment of the gravity of the errors, but the peculiar posture of this case. It was originally tried five years ago and re-tried three years ago. The sentence upon re-trial—reduction one pay grade and restriction for fifteen days—was no more than could have been imposed at nonjudicial punishment, leaving us little room for meaningful relief. We also deem it relevant that Appellant was subsequently administratively separated. *See United States v. Jackson*, 3 M.J. 153, 154 (C.M.A. 1977) ("While an error of this nature would normally warrant remand for a new review and action, we deem the termination of the proceedings to be more appropriate in view of the appellant's discharge from the service."). And, as noted, we have concerns about the value of a remand for further fact-finding given the time that has elapsed, the detailed objective manifestations of the influence of rank we would be seeking, and the difficulty that members already expressed in recalling such details. For all these reasons, we exercise our authority under Article 66(c), UCMJ, to disapprove the findings and sentence.

## Decision

The findings and sentence are set aside. The Charge and its Specification are dismissed with prejudice.

Chief Judge McCLELLAND and Judge KOSHULSKY concur.



For the Court,

Robin Duffy Auth
Clerk of the Court